# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | No. 12-_____ |
| | ) | |
| Plaintiff, | ) | **COUNT ONE** |
| | ) | **18 U.S.C. § 641** |
| v. | ) | (Theft of Government Money) |
| | ) | |
| **RAYMOND SALVA**, | ) | NMT Ten Years Imprisonment |
| [DOB: 08/26/1947], | ) | NMT $250,000 Fine |
| | ) | NMT Three Years Supervised Release |
| Defendant. | ) | Class C Felony |
| | ) | $100 Mandatory Special Assessment |
| | ) | |
| | ) | **COUNT TWO** |
| | ) | **42 U.S.C. § 408(a)(4)** |
| | ) | (Social Security Disability Fraud - Failing to |
| | ) | Disclose Material Events) |
| | ) | |
| | ) | NMT Five Years Imprisonment |
| | ) | NMT $250,000 Fine |
| | ) | NMT Three Years Supervised Release |
| | ) | Class D Felony |
| | ) | $100 Mandatory Special Assessment |
| | ) | |
| | ) | **COUNT THREE** |
| | ) | **42 U.S.C. § 408(a)(3)** |
| | ) | (Social Security Disability Fraud - Making |
| | ) | False Statements) |
| | ) | |
| | ) | NMT Five Years Imprisonment |
| | ) | NMT $250,000 Fine |
| | ) | NMT Three Years Supervised Release |
| | ) | Class D Felony |
| | ) | $100 Mandatory Special Assessment |
| | ) | |
| | ) | **COUNT FOUR** |
| | ) | **18 U.S.C. § 1001(a)(2)** |
| | ) | (False Official Statement) |
| | ) | |
| | ) | NMT Five Years Imprisonment |
| | ) | NMT $250,000 Fine |
| | ) | NMT Three Years Supervised Release |
| | ) | Class D Felony |
| | ) | $100 Mandatory Special Assessment |

|   |                                           |
|---|-------------------------------------------|
| ) | **COUNT FIVE**                            |
| ) | **18 U.S.C. § 1341**                      |
| ) | (Mail Fraud)                              |
| ) |                                           |
| ) | NMT Twenty Years Imprisonment             |
| ) | NMT $250,000 Fine                         |
| ) | NMT Three Years Supervised Release        |
| ) | Class C Felony                            |
| ) | $100 Mandatory Special Assessment         |
| ) |                                           |
| ) | Order of Restitution                      |

# I N D I C T M E N T

**THE GRAND JURY CHARGES THAT:**

INTRODUCTION AND BACKGROUND

1. In about February 2000, the Social Security Administration ("SSA") approved an application for Title II Social Security Disability Insurance Benefits submitted by the defendant, **Raymond Salva**. His claimed disability was a neck injury allegedly sustained in a farm accident. Title II disability beneficiaries are entitled to receive Social Security payments based on a determination by SSA that they are medically disabled and unable to work as a result of their disabilities. The Title II Program is federally funded. Disability beneficiaries have a duty to report to SSA if they return to work because their eligibility for disability payments may be affected by their work activity. In the defendant's application for Disability Insurance Benefits, dated and signed by him on September 30, 1998, he agreed to notify SSA if he returned to work.

2. SSA is an agency of the United States Government. SSA administers the Social Security Disability Insurance Benefits Program, which pays monthly cash benefits to individuals who have worked and paid Social Security taxes. To be eligible for monthly cash benefits under the program, individuals must have reached the age of sixty-two or have been found by SSA to

2

be medically "disabled" (as that term is defined by the Social Security Act). To receive Title II disability benefits, SSA must determine that an individual's medical disability prohibits him or her from working at a substantial gainful activity level. If an individual earns more than a certain monthly amount set by federal regulations, that individual is generally considered to be working at a substantial gainful activity level. Beneficiaries who are working at a substantial gainful activity level are typically not eligible to receive Title II disability payments. They always have a duty to report their work activity to SSA.

3. Title II disability beneficiaries returning to work are allowed to test their ability to work for 9 months during a period of time that SSA refers to as a trial work period. During the trial work period, SSA still considers the beneficiary disabled. SSA finds that the beneficiary's disability ends after the beneficiary has worked 9 months within a rolling 60-month period, if the work during those 9 months exceeds an amount set by SSA. The trial work period concept was designed to encourage disabled beneficiaries to rejoin the work force. Even though beneficiaries are permitted to work during their trial work periods, they still have a duty to report their work activity to SSA.

4. SSA initially denied the defendant's application for Disability Insurance Benefits based on a decision that he was not disabled. The defendant requested reconsideration of that decision, and on or about August 24, 1999, SSA sent the defendant a letter explaining that the initial decision denying him benefits was proper. The letter further advised that to qualify for Disability Insurance Benefits, an individual's health problems must keep him or her "from doing any kind of substantial work." The letter stated that "[g]enerally, substantial work is physical or mental work you are paid to do." The defendant appealed this denial of benefits and requested a

3

hearing before an Administrative Law Judge ("ALJ"). In a decision dated February 18, 2000, an SSA ALJ found that the defendant was disabled.

5. Based on the ALJ's decision, SSA began issuing Title II disability benefit payments to the defendant. SSA's regular practice was to issue benefit payments through checks issued by the United States Department of Treasury and mailed to the defendant at his residence located in the Western District of Missouri by the United States Postal Service.

6. In or about May 2003, SSA conducted a continuing disability review in order to determine whether the defendant, **Raymond Salva**, remained eligible to receive Social Security disability payments. As part of that review, the defendant completed an SSA form labeled "Report of Continuing Disability Interview." The defendant signed the "Report of Continuing Disability Interview" and dated it June 9, 2003. He affirmed that the statements he provided in the form were true. Immediately above his signature, the form warned him that "anyone who makes a false statement or representation of a material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal Law." Also above his signature was the statement: "I agree to notify the Social Security Administration if my medical condition improves or I go to work." On the form, the defendant reported that he did not feel able to return to work. The form asked: "Since you became disabled, have you done any work?" In response, the defendant checked a box indicating "No."

7. In fact, the defendant's response of "No" was completely false, as the defendant well knew. The defendant began working as a Missouri state representative in January 2003 and held that office through December 2010. He earned over $30,000 each year that he was in office. Based on his earnings, the defendant worked at a substantial gainful activity level from January

4

2003 through December 2010. The defendant's trial work period ended in or about September 2003, and he became ineligible for Social Security Disability Insurance Benefits beginning in or about January 2004.

8. On or about October 2, 2003, SSA determined that the defendant's disability was continuing based on a review of his records and the information he provided in the "Report of Continuing Disability Interview." In making this determination, SSA relied, in part, on the defendant's false claim that he had not worked since he became disabled. SSA sent a letter to the defendant informing him of this decision and reminding him to report any work activity, regardless of the amount of earnings. SSA continued to pay the defendant Disability Insurance Benefits, not knowing that the defendant was working at a substantial gainful activity level. The defendant should have stopped receiving Title II disability benefits in or about January 2004.

9. On or about December 29, 2004, SSA discovered that earnings had been posted to the defendant's record. SSA sent a letter to the defendant asking him about his work activity. The letter included a work and earning summary that listed the defendant's income as over $30,000 for 2003. The letter indicated that earnings information was not available for work activity in the current year. On or about January 7, 2005, the defendant completed the work activity report that SSA gave him. On the form, SSA indicated that the information he provided would help it determine if he "should get or keep getting benefits." The defendant reported that he began working as a state representative in January 2003. In a section of the form that asked the defendant for an explanation of his earnings, he wrote: "I checked before I ran for the office in Washington, D.C. and was told public service would not effect [sic] my disability benefits." At the end of the form, the defendant wrote: "The total amount paid by the State of MO barely

5

covers my total cost of being a rep. Before I ran for state rep I checked with SSA in Washing [sic] D.C. and was told that benefits are not in jeopardy if public service was an option."

10. In the section of the work activity report concerning his work as a state representative, the defendant checked boxes indicating: "I stopped working within 6 months, or I reduced my work hours and earnings within 6 months, or within 6 months I had to change the type of work I was doing . . . because . . . of my medical condition" and "special conditions at work related to my medical condition that allowed me to work were removed." On the form, SSA also asked the defendant whether he spent any money of his own earnings "for any things or services related to [his] condition that allowed [him] to work and for which [he] did not get paid back." The form listed braille equipment, special telephone equipment, and other items as examples. In response, the defendant listed "cell phone," "rent," "utilities," "medical," "transportation," "dry cleaning," and "meals."

11. On or about May 15, 2005, SSA sent the defendant a notice informing him that he was no longer entitled to disability payments for January 2004 through December 2004 due to his work activity. The notice explained that the defendant was entitled to payments beginning January 2005 because he was no longer doing substantial work. SSA made the decision that the defendant was no longer doing substantial work based, at least in part, on incorrect information it received from the State of Missouri that erroneously failed to identify the income the defendant received in 2005. In fact, the defendant was still working at a substantial gainful activity level as a state representative.

12. The May 15, 2005 notice also informed the defendant that he was overpaid $17,848 due to his work activity. It advised the defendant that his trial work period ended in

6

September 2003, and that he had an extended period of eligibility from October 2003 through September 2006. The notice stated that, during this extended period of eligibility, SSA would "restart payments for any month(s) your work is not substantial if your health problems still meet our rules." In addition, the notice advised the defendant that SSA pays benefits for the month disability ends and the following two months. In his case, the notice explained, these months were October 2003 through December 2003. Finally, the notice again advised the defendant of his reporting responsibilities and reminded him to let SSA know if he "went to work since [his] last report" or if he returned to work in the future.

13.     SSA sent the defendant a letter describing his repayment schedule on or about July 4, 2005. The total overpayment caused by the defendant's failure to report his work activity between approximately January 2004 and December 2004 was approximately $17,848. The letter indicated that his monthly benefit payments would be fully withheld beginning July 2005 and continuing through May 2006 to recoup the overpayment. In June 2006, part of his monthly benefit check would be withheld to repay the remaining balance of his overpayment. SSA did withhold the defendant's benefits during this time frame. In or about July 2006, the defendant began receiving Disability Insurance Benefit checks again.

14.     On or about January 9, 2007, SSA sent the defendant a letter informing him that it had information about his work and earnings that could affect his benefit payments. SSA stated that it appeared it would decide that the defendant's disability ended in October 2003 and that he was not entitled to disability payments for January 2004 forward. The letter indicated that it determined the defendant's work for the State of Missouri began in January 2003 and had not ended. It asked the defendant to provide any additional information he wanted SSA to consider.

On or about January 29, 2007, SSA sent the defendant a letter confirming that he was not entitled to disability benefit payments for January 2004 forward.

15. On or about February 26, 2008, SSA sent a letter to the defendant concerning its previous decision that he was not entitled to disability benefit payments. The letter notified the defendant that because of a mistake SSA did not stop his disability payment benefit checks in January 2007, when it made the decision that he was not entitled to benefits. The letter indicated that SSA was now stopping his benefit checks.

16. On or about March 16, 2008, SSA sent a letter to the defendant notifying him of the overpayment he accrued from in or about January 2004 through in or about February 2008. The letter stated that the defendant received $60,597 in benefit payments that he was not due. On or about March 21, 2008, SSA notified the defendant that because it was able to stop his March payment the overpayment amount was $58,917 rather than $60,597. SSA sent the defendant a billing statement for $58,917 on or about September 4, 2008.

17. The defendant requested reconsideration of the overpayment decision on or about October 10, 2008, stating that his disability had never changed. In a letter attached to his request, he indicated that a judge in Jackson County Circuit Court had issued a decision finding him disabled and that the judge had told him that this decision was "still valid" and was "not to be compromised by the Social Security Office." In fact, judges in Jackson County Circuit Courts do not issue disability decisions for SSA. SSA concluded that the overpayment decision was correct and sent the defendant a letter informing him of this decision on or about June 7, 2009. On or about January 3, 2011, the defendant completed a new application for Disability Insurance Benefits. He stated that he became unable to work as of August 1, 1996. However, he reported

8

working from January 2003 through December 2010. The defendant withdrew this application on or about February 20, 2011.

18. The defendant appealed SSA's overpayment decision and testified before an SSA Administrative Law Judge ("ALJ") at two administrative hearings. At the first administrative hearing, held on or about November 2, 2010, the defendant contended that he did not receive all the payments that SSA included in its overpayment determination. When discussing the benefit checks, the defendant stated: "My bank records will indicate they've never been put in my bank. We only have one account. I didn't receive this money that they say I owe." The defendant then stated: "04' they held their checks to repay 2003." The ALJ then asked: "The entire year?" The defendant responded: "Yes, sir." The defendant continued: "In 2005, I received them [checks] for four months, and they cut them off. In 2006, the same way. From January, February, March, and April, and in May they cut them off." The ALJ asked: "What about 2007?" The defendant responded: "They did the same thing." The defendant stated: "The amount of checks that they held back to pay back far exceeds the amount that they say I owe." The defendant later asserted: "I think I owe them the first six months." Near the end of the hearing, the defendant told the ALJ that if SSA had the canceled checks, "this would be over in five minutes." The ALJ and the defendant spoke the words contained within the quotation marks in this paragraph, or words to that effect.

19. Several of the defendant's oral statements were false. For example, the defendant's claim that "we only have one account" was false. The defendant had an account with US Bank, and he and his wife had an account with First National Bank of Missouri. The defendant's assertions regarding non-receipt of his disability benefits were also false. Contrary

9

to the defendant's claims that SSA did not send him disability benefit checks during several different time periods, SSA withheld benefits for only one time period, beginning in or around July 2005 and continuing through in or around June 2006.  SSA withheld benefits during this time period to recoup the overpayment made to the defendant as a result of his failure to report his work activity to the agency.  Other than this time period, SSA sent the defendant disability checks monthly until stopping them in or around February 2008.

20.     In response to the ALJ's questions about his work schedule and travel to Jefferson City, Missouri, the defendant indicated that he was paid every month, even for those months when the legislature was not in session in Jefferson City.  He then declared: "But you can't say that I am not working.  Even though you're not down there, my constituency base, I'm busy every day.  Today, when I leave here, I'll go back, I'll have five phone calls of people who are getting screwed on their Social Security, Workmen's Comp, Division of Employment Security, and I work on that," or words to that effect.

21.     At the second administrative hearing, held on or about February 8, 2011, the defendant discussed his receipt of his Disability Insurance Benefits, telling the ALJ:  "In 2004 and 2005 I received those payments up until June of 2005.  July, August, September, October, November, December of 2005 I received no payments.  January of 2006, January, February, March, April, and May I received no payments.  They started sending me a check, they say they did, on June of 2006 of $899 dollars.  I did not receive that . . . July $1,588 I did not receive. $1,588 for August I did not receive, for September I did not receive, for October I did not receive.  November $1,610 I did not receive, and the $1,642 December I did not receive. . . . January of 2007 I did receive a check, $1,642 dollars. . . . in February, March, April, May, June,

July, August, September, October, and November, I did not receive payment, but they say I did, $1,642 dollars. December of 2007 I did receive a check for $1,680 dollars, and in January of 2008 they say I received a check for $1,680 dollars which I did not receive. . . . I brought our checking account in showing that I did not receive those. . . . I never received these payments," or words to that effect. The defendant gave the ALJ copies of bank statements from First National Bank of Missouri for account number *****6387, a checking account he owned jointly with his wife.

22. In fact, the defendant had his own bank account with US Bank at account number ********6451 and presented at least some of his Disability Insurance Benefit checks to that bank. He presented Disability Insurance Benefit checks dated July 25, 2007, September 26, 2007, and November 28, 2007, to US Bank, for cash or deposit into his account, or both. He signed the back of each check, and deposited or cashed them, despite the fact that he falsely reported to the ALJ that he did not receive disability payments for these months.

23. During the second administrative hearing, the defendant indicated that he took office as a Missouri State representative in January 2003. He stated that he thought he earned, at that time, $26,000 each year. The defendant stated that he remained in office until December 31, 2010. The ALJ asked: "Now when you got the job as the legislator, did you talk to Social Security?" The defendant responded: "No, sir." The ALJ asked: "Why not?" The defendant responded: "Total oversight on my part." The ALJ then asked: "Did you think you could continue to get disability benefits and earn $2,200 dollars a month?" The defendant stated: "Yes, sir." The ALJ asked: "Why?" The defendant responded: "I just didn't think that being elected job was something that, even though you had to earn money, there wasn't any physical

work exerted, and I thought that's the reason you were on disability, because of your physical stature rather than your mental." The ALJ and the defendant spoke the words contained within the quotation marks in this paragraph, or words to that effect.

24. The defendant later stated at this second administrative hearing: "There was no correspondence from the Social Security Administration to me saying, Mr. Salva, now that you have been elected and you're getting this income. They kept paying me, so I didn't know that there was a 9-month trial period. I didn't know that I couldn't receive it. I took it for granted that I could because they kept paying me." The ALJ said: "Well you're presumed to know that you can't." The defendant responded: "I understand. And being a lawmaker, I do understand that, and, you know, it was my, I didn't take those checks saying Oh, boy, I'm screwing somebody here. It was because I didn't know. I just didn't know." The ALJ and the defendant spoke the words contained within the quotation marks in this paragraph, or words to that effect.

25. On or about April 11, 2011, the ALJ issued a decision finding the defendant at fault in causing the overpayment. He found that the defendant was not entitled to waiver of the overpayment.

26. On or about April 28, 2011, the defendant submitted a "Request for Review of Hearing Decision/Order," in which he asked the Appeals Council of SSA to review the ALJ's decision. He also submitted a letter with his request. In that letter, the defendant indicated that he received a check for $1,642 in January 2007. He stated that he "should only be responsible for $1,642 of overpayment, not $58,917."

27. The defendant also requested reinstatement of his benefits on or about April 28, 2011. He completed a work activity report concerning work since 2004. The defendant reported

working as a state representative from January 2004 to December 2010. He stated that he earned $2,660 each month.

28. On or about November 16, 2011, Special Agents Bruce McKimens and Kimberly Southard of the SSA Office of the Inspector General interviewed the defendant. The defendant admitted that he worked as a Missouri state representative from January 2003 until January 2011. The defendant stated that he did not consider his position as a state legislator work because it required him to use his mind rather than his body. He said he considered work to be physical labor. The defendant also claimed that he had verified with someone in the judicial branch in Washington, D.C. that his work as a state representative would not impact his eligibility for Disability Insurance Benefits. When Special Agent McKimens asked him to identify this individual, he was unable to do so. The defendant stated that SSA should be partly to blame because SSA knew he was still working. He reported that his case was pending and would be heard in federal court in March 2012 by a judge in Washington, D.C. In fact, the defendant had no case pending in federal court in Washington, D.C.

## COUNT ONE
(Theft of Government Money)

29. The factual allegations in the introduction and background section are incorporated herein by reference.

### The Charge

30. From in or about January 2003, and through in or about February 2008, within the Western District of Missouri, as part of a single continuing scheme involving the Social Security Administration ("SSA"), the defendant, **Raymond Salva**, willfully and knowingly did steal,

convert to his own use, and purloin goods, property and money of the United States having a value in excess of One Thousand Dollars ($1,000), and the defendant did so with intent to deprive the owner of the use or benefit of the money so taken. Specifically, the defendant caused SSA to pay him monthly Social Security Title II Disability Insurance Benefit payments that he was not entitled to receive because he intentionally failed to report and concealed from SSA his earnings and work activity. The defendant's acts to obtain Title II Social Security disability payments constitute theft and unlawful conversion of money belonging to the United States.

All in violation of Title 18, United States Code, Section 641.

## COUNT TWO
(Social Security Disability Fraud - Failing to Disclose Material Events)

31.     The factual allegations in the introduction and background section are incorporated herein by reference.

### The Charge

32.     From in or about January 2003, and through in or about February 2008, within the Western District of Missouri, as part of a single continuing scheme involving the Social Security Administration ("SSA"), the defendant, **Raymond Salva**, having knowledge of the occurrence of an event affecting his continued right to payment of SSA Title II Disability Insurance Benefits, concealed and failed to disclose such event with the intent to fraudulently secure payment when no payment was authorized. Specifically, the defendant intentionally concealed and failed to disclose his work activity for the purpose of causing SSA to make Title II Disability Insurance Benefit payments when the defendant was otherwise ineligible to receive such payments.

All in violation of Title 42, United States Code, Section 408(a)(4).

14

## COUNT THREE
(Social Security Disability Fraud - Making False Statements)

33. The factual allegations in the introduction and background section are incorporated herein by reference.

### The Charge

34. On or about February 8, 2011, in Kansas City, Missouri, within the Western District of Missouri, the defendant, **Raymond Salva**, in a matter within the jurisdiction of the Social Security Administration ("SSA"), knowingly and willfully made and caused to be made a false statement and representation for use in determining his rights to payment under the Social Security Act, specifically in determining whether SSA overpaid him, to what extent SSA overpaid him, and his responsibility to pay SSA back. The defendant stated and represented to an SSA Administrative Law Judge ("ALJ") that he did not receive Disability Insurance Benefit checks from February 2007 through November 2007. These statements and representations were completely false, as the defendant well knew, because the defendant presented Disability Insurance Benefit checks dated July 25, 2007, September 26, 2007, and November 28, 2007, to US Bank, for cash or deposit into his account, or both. The defendant's receipt of these Disability Insurance Benefit checks was material in SSA's determination of the overpayment amount and the defendant's responsibility to pay SSA that amount.

All in violation of Title 42, United States Code, Section 408(a)(3).

## COUNT FOUR
(False Official Statement)

35. The factual allegations in the introduction and background section are incorporated herein by reference.

15

The Charge

36. On or about November 16, 2011, in Sugar Creek, Missouri, and within the Western District of Missouri, the defendant, **Raymond Salva**, in a matter within the jurisdiction of the Social Security Administration, an agency of the executive branch of the United States, knowingly and willfully made false, fictitious, and fraudulent statements and representations to Special Agents of the Office of the Inspector General for the Social Security Administration, in that the defendant stated and represented to the federal agents that he had verified with someone in the judicial branch in Washington, D.C. that his work as a state representative would not impact his eligibility for Disability Insurance Benefits and that he had a case that would be heard in federal court by a judge in Washington, D.C., or words to that effect. These statements and representations were completely false, as the defendant well knew, because no one informed the defendant that his work as a state representative would not impact his eligibility for Disability Insurance Benefits, and the defendant had no case pending before a federal court in Washington, D.C. The defendant made these statements and representations in order to mislead the federal agents.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT FIVE
(Mail Fraud)

37. The factual allegations in the introduction and background section are incorporated herein by reference.

## The Scheme

38. Beginning in or about January 2003, and continuing until in or about February 2008, within the Western District of Missouri, the defendant, **Raymond Salva**, devised and intended to devise a single and continuing scheme and artifice to defraud the Social Security Administration ("SSA"), and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises – specifically to obtain Social Security Title II Disability Insurance Benefit payments that he was not entitled to receive.

39. It was part of the scheme and artifice to defraud and to obtain Title II Disability Insurance Benefit payments by false and fraudulent pretenses, representations and promises and in furtherance of it that the defendant, **Raymond Salva**, knowingly and intentionally failed to disclose to SSA his work activity and made false representations to SSA to conceal his work activity and income from that work activity and continue to fraudulently receive Title II Disability Insurance Benefit payments that he was not entitled to receive due to his work activity.

40. By knowingly and intentionally failing to disclose to SSA his work activity and income from that work activity, the defendant, **Raymond Salva**, caused SSA to issue Title II Disability Insurance Benefit payments between in or about January 2004 and February 2008, which the defendant was not entitled to receive.

## The Charge

41. The factual allegations in the introduction and background section and paragraphs 37 through 40 are incorporated herein by reference.

42. On or about November 28, 2007, within the Western District of Missouri and elsewhere, the defendant, **Raymond Salva**, with the intent to defraud and deprive, and for the

purpose of executing and attempting to execute the scheme and artifice to defraud, knowingly caused to be delivered by the United States Postal Service, according to the direction thereon, to 11422 Park, Sugar Creek, Missouri 64054, a United States Treasury check issued in Philadelphia, Pennsylvania, by the Department of the Treasury on behalf of the Social Security Administration, for Disability Insurance Benefits awarded to the defendant, in the amount of $1,642.

All in violation of Title 18, United States Code, Section 1341.

A TRUE BILL.

\_\_\_\_\_11/27/12_____ \_\_\_/s/ Albert J. Byrd_____
DATE                                                                   FOREPERSON OF THE GRAND JURY

\_\_\_/s/ William A. Alford III_____
WILLIAM A. ALFORD III
Special Assistant U.S. Attorney